# 25-1225-cv

## United States Court of Appeals

*for the*

## Second Circuit

NORTH AMERICAN SOCCER LEAGUE, LLC,

*Plaintiff-Appellant,*

– v. –

UNITED STATES SOCCER FEDERATION, INC.,
MAJOR LEAGUE SOCCER, L.L.C.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## FINAL FORM BRIEF FOR PLAINTIFF-APPELLANT

MATTHEW PEARSON
DANIEL L. WARSHAW
PEARSON WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
(818) 788-8300

JEFFREY L. KESSLER
EVA W. COLE
JOHANNA HUDGENS
MARK EDWARD RIZIK
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

*Attorneys for Plaintiff-Appellant*

 COUNSEL PRESS (800) 4-APPEAL • (385012)

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellant North American Soccer League, LLC ("NASL") hereby discloses that its members and parent corporations are the New York Cosmos LLC, Puerto Rico FC, LLC, and Jax Soccer Holdings, LLC. No publicly traded corporation holds more than 10% of North American Soccer League, LLC's stock.

i

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... 1

STATEMENT OF JURISDICTION ........................................................ 6

STATEMENT OF THE ISSUES ............................................................. 6

STATEMENT OF THE CASE ................................................................ 8

    A.    Factual Background ........................................................ 8

    B.    Proceedings Below ...................................................... 15

SUMMARY OF ARGUMENT ............................................................... 19

STANDARDS OF REVIEW ................................................................. 24

ARGUMENT ....................................................................................... 25

    I.    The district court committed reversible error by granting summary judgment against Count 1 .................................... 25

        A.    The district court erred when it held that NASL could not prove antitrust injury from the Standards themselves. ................................................................. 26

        B.    On remand, Count 1 can be proven either through *per se* liability, quick-look analysis, or direct evidence of anticompetitive effects. ............................................... 30

    II.    The district court committed reversible error by requiring NASL to prove a relevant market to prevail on Counts 2 through 5. ............................................................................ 34

        A.    NASL's Section 1 claim under Count 2 did not require proof of the relevant market. ........................................ 34

        B.    NASL's Section 2 claims for monopolization and attempted monopolization (Counts 4 and 5) also did not require proof of a relevant market. ............................. 40

        C.    NASL's claim for conspiracy to monopolize (Count 3) did not require proof of a relevant market. ................. 43

        D.    The district court also committed error by requiring NASL to prove the specific relevant markets that it alleged. ............................................................................ 48

ii

E. NASL did not waive or forfeit its relevant-market arguments. ....................................................... 49

    1. NASL did not commit waiver. ............................ 49

    2. NASL did not commit a forfeiture. ..................... 50

    3. There was no waiver or forfeiture based on NASL's statements at a pretrial conference. ..... 52

III. The district court abused its discretion in three critical evidentiary rulings which deprived NASL of a fair trial. .... 54

A. The McKinsey report .................................................. 55

B. The 2015 proposed Standards. ................................... 61

C. Fifth Amendment invocations of a Traffic executive. .. 64

IV. The district court's exclusion of Dr. Williams' "but-for" world damages assumption was an abuse of discretion. ............... 69

CONCLUSION ....................................................................... 72

CERTIFICATE OF COMPLIANCE ...................................... 74

CERTIFICATE OF SERVICE ............................................... 75

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 650 Fifth Ave. & Related Props.*,
934 F.3d 147 (2d Cir. 2019) ........................................................22, 67

*1-800 Contacts, Inc. v. FTC*,
1 F.4th 102 (2d Cir. 2021) ....................................................................35

*Abington Emerson Cap. v. Adkins*,
2021 WL 611998 (S.D. Ohio Jan. 22, 2021) ........................................68

*Allied Tube & Conduit Corp. v. Indian Head*,
486 U.S. 492 (1988) ....................................................................21, 31, 34

*In re Aluminum Warehousing Antitrust Litig.*,
2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014), *aff'd*, 833
F.3d 151 (2d Cir. 2016) ...............................................................41, 42

*Am. Needle, Inc. v. NFL*,
560 U.S. 183 (2010) ......................................................................25, 27

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946) ......................................................................44, 47

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987) ................................................................59

*Associated Press v. United States*,
326 U.S. 1 (1945) ..........................................................................20, 27

*B&R Supermarket, Inc. v. Visa Inc.*,
2024 WL 4252031 (E.D.N.Y. Sep. 20, 2024) ......................................36

*Belfiore v. N.Y. Times*,
826 F.2d 177 (2d Cir. 1987) ................................................................45

*Blanksteen v. N.Y. Mercantile Exch.*,
879 F. Supp. 363 (S.D.N.Y. 1995) .......................................................35

iv

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) ................................................................ 41

*Carter-Wallace v. Hartz Mountain Indus.*,
1983 WL 1805 (S.D.N.Y. Apr. 13, 1983) ............................................ 69

*Charych v. Siriusware*,
2018 WL 4870906 (E.D.N.Y. July 30, 2018), *aff'd*, 790 F.
App'x 299 (2d Cir. 2019) ................................................................... 45

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
363 F. Supp. 2d 514 (E.D.N.Y. 2005), *aff'd*, 604 F.3d 98
(2d Cir. 2010) ..................................................................................... 37

*Doe v. Trump Corp.*,
6 F.4th 400 (2d Cir. 2021) ................................................................. 50

*Douglas v. Alabama*,
380 U.S. 415 (1965) ........................................................................... 53

*Dupree v. Younger*,
598 U.S. 729 (2023) ........................................................................... 51

*E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*,
241 F.3d 154 (2d Cir. 2001) ......................................................... 24, 51

*Elecs. Commc'ns v. Toshiba*,
129 F.3d 240 (2d Cir. 1997) .............................................................. 43

*Emigra Grp. v. Fragomen*,
612 F. Supp. 2d 330 (S.D.N.Y. 2009) ............................................... 44

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) ............................................................... 30, 31, 35

*FTC v. Superior Ct. Trial Laws. Ass'n*,
493 U.S. 411 (1990) ........................................................................... 35

*Gardner-Alfred v. Fed. Rsrv. Bank of N.Y.*,
2025 WL 1813025 (2d Cir. July 2, 2025) .......................................... 61

v

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) ............................................................... 31

*Geneva Pharms. Tech. v. Barr Lab's Inc.*,
  386 F.3d 485 (2d Cir. 2004) ............................................................... 40

*Girden v. Sandals Int'l*,
  262 F.3d 195 (2d Cir. 2001) ............................................................... 52

*Hahn v. Or. Physicians' Serv.*,
  868 F.2d 1022 (9th Cir. 1988) ............................................................ 59

*Hayden Publ'g Co. v. Cox Broad. Corp.*,
  730 F.2d 64 (2d Cir. 1984) ................................................................. 48

*Heerwagen v. Clear Channel*,
  435 F.3d 219 (2d Cir. 2006) ......................................................... 41, 42

*United States ex rel. Hockett v. Columbia/HCA Healthcare
  Corp.*,
  498 F. Supp. 2d 25 (D.D.C. 2007) ..................................................... 68

*Hudson Valley Asbestos v. Tougher Heating*,
  510 F.2d 1140 (2d Cir. 1975) ....................................................... 44, 45

*Hydrolevel Corp. v. Am. Soc'y of Mech. Eng'rs., Inc.*,
  635 F.2d 118 (2d Cir. 1980), *aff'd*, 456 U.S. 556 (1982) .............. 31, 58

*IHS Dialysis Inc. v. Davita, Inc.*,
  2013 WL 1309737 (S.D.N.Y. Mar. 31, 2013) ................................ 21, 44

*Int'l Distrib. Ctrs. v. Walsh Trucking Co.*,
  812 F.2d 786 (2d Cir. 1987) ......................................................... 43, 47

*Jacques v. DiMarzio, Inc.*,
  386 F.3d 192 (2d Cir. 2004) ............................................................... 52

*Keen v. Overseas Tankship Corp.*,
  194 F.2d 515 (2d Cir. 1952) ............................................................... 53

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) ...................................... 71

*L.A. Mem'l Coliseum v. NFL*,
726 F.2d 1381 (9th Cir.), *cert. denied*, 469 U.S. 990 (1984) .............. 48

*LiButti v. United States*,
107 F.3d 110 (2d Cir. 1997) ........................................................ 68

*Malek v. Fed. Ins. Co.*,
994 F.2d 49 (2d Cir. 1993) .......................................................... 55

*Marcic v. Reinauer Transp. Cos.*,
397 F.3d 120 (2d Cir. 2005) ........................................................ 25

*Mujo v. Jani-King Int'l, Inc.*,
13 F.4th 204 (2d Cir. 2021) ......................................................... 24

*N.E. Tel. Co. v. AT&T*,
651 F.2d 76 (2d Cir. 1981), *cert. denied*, 455 U.S. 943
(1982) ........................................................................................ 45

*N.Y. v. Hendrickson Bros., Inc.*,
840 F.2d 1065 (2d Cir. 1988) ...................................................... 72

*NASL v. USSF*,
883 F.3d 32 (2d Cir. 2018) .................................................... 20, 28

*NCAA v. Alston*,
594 U.S. 69 (2021) ........................................................ 26, 27, 39

*NCAA v. Bd. of Regents*,
468 U.S. 85 (1984) .............................................................. 27, 39

*Ohio v. American Express*,
585 U.S. 529 (2018) ........................................ 21, 25, 26, 33, 35, 37

*P&L Dev. v. Gerber Prods.*,
715 F. Supp. 3d 435 (E.D.N.Y. 2024) ........................................... 45

vii

*Palin v. N.Y. Times Co.*,
  113 F.4th 245 (2d Cir. 2024)......................................................54

*PepsiCo, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) .................................................21, 41

*In re Pub. Paper Antitrust Litig.*,
  690 F.3d 51 (2d Cir. 2012) ...................................................27, 29

*Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*,
  364 U.S. 656 (1961)...............................................................20, 34

*Re/Max Int'l v. Realty One*,
  173 F.3d 995 (6th Cir. 1999)........................................................41

*Regeneron Pharm. v. Novartis Pharma*,
  96 F.4th 327 (2d Cir. 2024)...........................................................47

*Relevent Sports v. USSF*,
  61 F.4th 299 (2d Cir. 2023).............................................20, 28, 40

*Restivo v. Hessemann*,
  846 F.3d 547 (2d Cir. 2017) .........................................................25

*Richardson v. Corr. Med. Care, Inc.*,
  2023 WL 3490904 (2d Cir. May 17, 2023).................................71

*Rochester Drug Co-Op. v. Mylan Inc.*,
  2022 WL 1598377 (D. Minn. May 20, 2022) .............................63

*Royal & Sun All. Ins. v. UPS Supply Chain Sols.*,
  2011 WL 3874878 (S.D.N.Y. Aug. 31, 2011) ............................57

*Saint-Jean v. Emigrant Mortg. Co.*,
  129 F.4th 124 (2d Cir. 2025)........................................................24

*In re Set-Top Cable Television Box Antitrust Litig.*,
  2011 WL 1432036 (S.D.N.Y. Apr. 8, 2011), *aff'd*, 836 F.3d
  137 (2d Cir. 2016)..........................................................................37

*Shak v. JPMorgan Chase*,
  156 F. Supp. 3d 462 (S.D.N.Y. 2016)....................................42, 45

viii

*Shields v. World Aquatics,*
2024 WL 4211477 (9th Cir. Sep. 17, 2024) ........................ 20, 30, 33, 36

*Sidibe v. Sutter Health,*
103 F.4th 675 (9th Cir. 2024) ...................................................... 55, 64

*Silver v. N.Y. Stock Exch.,*
373 U.S. 341 (1963) ........................................................................... 34

*Simon-Whelan v. Andy Warhol Found.,*
2009 WL 1457177 (S.D.N.Y. May 26, 2009) ..................................... 58

*Sitts v. Dairy Farmers of Am.,*
2020 WL 3467993 (D. Vt. June 24, 2020) ......................................... 58

*Spectrum Sports v. McQuillan,*
506 U.S. 447 (1993) ............................................................... 42, 43, 46

*Tereshchenko v. Karimi,*
102 F.4th 111 (2d Cir. 2024) ............................................................. 24

*Thornley v. Penton Publ'g,*
104 F.3d 26 (2d Cir. 1997) ................................................................ 52

*Toys "R" Us, Inc. v. FTC,*
221 F.3d 928 (7th Cir. 2000) ............................................................ 36

*In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prods.*
*Liab. Litig.,*
181 F. Supp. 3d 278 (E.D. Pa. 2016) ................................................ 63

*U.S. D.I.D. Corp. v. Windstream Commc'ns,*
775 F.3d 128 (2d Cir. 2014) ......................................................... 49, 53

*United States v. Apple, Inc.,*
791 F.3d 290 (2d Cir. 2015) .............................................................. 39

*United States v. Consol. Laundries,*
291 F.2d 563 (2d Cir. 1961) ......................................................... 44, 45

*United States v. E. I. du Pont de Nemours & Co.,*
351 U.S. 377 (1956) ........................................................................... 45

*United States v. Grinnell,*
  384 U.S. 563 (1966) ................................................................ 43

*United States v. Litvak,*
  808 F.3d 160 (2d Cir. 2015) .................................................... 54

*United States v. Olano,*
  507 U.S. 725 (1993) ................................................................ 50

*United States v. Pastore,*
  2022 WL 2068434 (2d Cir. June 8, 2022) ................................ 63

*United States v. Shapiro,*
  103 F.2d 775 (2d Cir. 1939) ............................................... 44, 47

*United States v. Visa USA, Inc.,*
  344 F.3d 229 (2d Cir. 2003) .................................................... 39

*United States v. Yellow Cab,*
  332 U.S. 218 (1947) ................................................................ 46

*In re Urethane Antitrust Litig.,*
  2013 WL 100250 (D. Kan. Jan. 8, 2013) ................................. 68

*USFL v. NFL,*
  842 F.2d 1335 (2d Cir. 1988) .................................................. 48

*Virgin Atl. v. Nat'l Mediation Bd.,*
  956 F.2d 1245 (2d Cir. 1992) .................................................. 54

*Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council,*
  857 F.2d 55 (2d Cir. 1988) ......................................... 28, 40, 45

*Warriors Sports v. NCAA,*
  623 F.3d 281 (6th Cir. 2010) .................................................. 62

*Woods v. START Treatment & Recovery Ctr.,*
  864 F.3d 158 (2d Cir. 2017) ......................................... 66, 67, 69

*Zenith Radio Corp. v. Hazeltine Rsch.,*
  395 U.S. 100 (1969) ....................................... 23, 27, 29, 72

x

*In re Zinc Antitrust Litig.*,
  155 F. Supp. 3d 337 (S.D.N.Y. 2016)................................................. 44

**Statutes**

28 U.S.C. § 1291.................................................................................... 6

28 U.S.C. § 1331.................................................................................... 6

28 U.S.C. § 1337.................................................................................... 6

**Other Authorities**

7 P. Areeda, Antitrust Law ¶ 1511 (1986)............................................. 30

Fed. R. Civ. P. 59 ................................................................. 6, 8, 49, 63

Fed. R. Evid. 401............................................................... 16, 62, 65

Fed. R. Evid. 403.................................................................. 16, 65

Fed. R. Evid. 801(d)(2)......................................................... 56

P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1808 .............................. 37

**PRELIMINARY STATEMENT**

Plaintiff-Appellant North American Soccer League ("NASL") brought claims under Sections 1 and 2 of the Sherman Antitrust Act against Defendants-Appellees, the United States Soccer Federation ("USSF") and Major League Soccer ("MLS"), for conspiring to adopt and apply the USSF's Professional League Standards ("Standards"), a set of rules restraining competition between soccer leagues, to protect the monopoly of MLS in men's Division 1 professional soccer, exclude competitor leagues, and drive NASL out of business. While this antitrust case's path to a jury verdict against NASL was long and complicated, with three different judges assigned during different phases, the legal errors requiring reversal are simple.

**First**, the district court erroneously dismissed Count 1, NASL's direct challenge to the Standards themselves as an unlawful agreement in restraint of trade under Section 1. NASL amended its complaint to add this claim after this Court stated at the preliminary-injunction stage that NASL could assert such a challenge. But the next district judge dismissed Count 1 on summary judgment, holding that NASL had not shown any antitrust injury to support a challenge to the Standards

1

themselves, and could only challenge the Standards' discriminatory *application* (Count 2). This was legal error. The governing case law allows challenges to anticompetitive membership organization rules that restrain or exclude a plaintiff from competing against other members, as the Standards did here.

**Second**, the district court compounded its error by holding that NASL's remaining antitrust claims (Counts 2–5) could not succeed unless the jury found one of NASL's asserted relevant markets, and by instructing the jury and issuing a verdict form accordingly. The jury's verdict against NASL rested solely on its finding that NASL had not proven any of its claimed relevant markets, without reaching the merits of Defendants' anticompetitive conduct. This was contrary to established law, which allows antitrust plaintiffs to prevail under Section 1 through *per se* or quick-look analysis, or by direct evidence of anticompetitive effects. None of these approaches requires proof of a relevant market. The same is true for Section 2 claims—they can be proven through direct evidence of anticompetitive effects. Proof of a relevant market is required only where such direct evidence is absent

2

and the plaintiff seeks to show an anticompetitive effect indirectly through the existence of market power.

**Third**, a new trial is also required because the following prejudicial evidentiary errors warrant reversal, both individually and cumulatively:

- *The exclusion of the McKinsey report*. The court excluded a USSF-commissioned McKinsey & Company report, which contained admissions by USSF Board members that MLS exerted a "stranglehold" over U.S. soccer, that the Board was dominated by MLS cofounder and USSF President Sunil Gulati, and that the Board merely "rubber stamped" USSF's decisions. Judge Cogan drew heavily on the McKinsey report in denying Defendants' summary judgment motions, holding that it was "admissible" and "highly relevant" evidence supporting NASL's claims. But following reassignment to Judge Gonzalez, the court granted Defendants' motion to exclude the McKinsey report, based on the conclusion that it was "*precluded by Judge Cogan's ruling.*"[1] This was plainly erroneous.

---

[1] All emphasis in quotations is added unless otherwise indicated.

- ***The exclusion of the 2015 proposed Standards***.  Judge Gonzalez also wrongly excluded evidence that in 2015, after learning of NASL's intent to seek Division 1 ("D1") certification (known as a "sanction"), USSF responded by proposing even more restrictive D1 Standards.  The court reasoned that unadopted rules could not injure NASL.  But this reasoning misses the point—the proposed Standards were highly relevant evidence of *Defendants' anticompetitive intent and the claimed conspiracy*.  Indeed, earlier in the case, Chief Judge Brodie had observed that these proposed Standards were the "*best support* [for] Plaintiff's argument of 'an escalation' of the [Standards] for the purpose of keeping MLS as the sole Division I league."

- ***Collateral Fifth Amendment invocations.***  Judge Gonzalez severely prejudiced NASL by allowing Defendants to present collateral evidence about the unrelated criminal activities of one of NASL's former team owners, Traffic Sports.  NASL did not participate in those activities and knew nothing about them.  Initially, at the *Daubert* stage, the court had held that Defendants could present limited evidence on this topic to argue that reputational impacts from Traffic's criminal conviction were an alternative theoretical cause of NASL's injuries.

4

But at trial, Judge Gonzalez went far beyond this narrow purpose. He let Defendants gratuitously play a deposition video of Traffic executive Aaron Davidson invoking the Fifth Amendment *75 times* at his deposition. The goal was simply to smear NASL by association with Traffic. Worse, the court then erred legally by issuing an adverse-inference instruction against NASL, based on these Fifth Amendment invocations about irrelevant and collateral issues. NASL had cut its ties to Davidson and Traffic years before the deposition took place.

**Fourth**, the district court erred by requiring NASL's expert to alter his opinions and thus reduce his damages estimate. In November 2016, NASL settled a contractual dispute with Team Holdings, a related entity, by paying $5.1 million to extinguish Team Holdings' right to a portion of NASL's team entry fees. The court held that it was improper for NASL's damages expert to assume that such a settlement would have occurred if NASL had received a D1 sanction in March 2016. But a settlement *actually happened in the real world*, and under *Daubert*, this is precisely the type of reasonable fact assumption about the "but-for" world that an expert can present to the jury to accept or reject. It should not have been excluded. This is especially true where,

as here, Defendants' own wrongdoing created the claimed uncertainty about what settlement would have been reached in the but-for world.

## STATEMENT OF JURISDICTION

This is an appeal under 28 U.S.C. § 1291 from a final judgment entered by the district court on February 3, 2025. A-3711.[2] NASL filed a timely motion for a new trial pursuant to Rule 59 on March 3, 2025 (E545), and the district court denied that motion on May 6, 2025 (A-3722). NASL filed a timely notice of appeal on May 8, 2025 (A-3757). The district court had subject-matter jurisdiction over NASL's antitrust claims under 28 U.S.C. §§ 1331 and 1337.

## STATEMENT OF THE ISSUES

1. Whether the district court erred by granting summary judgment dismissing Count 1, alleging that the Standards themselves are an anticompetitive agreement in violation of Section 1.

2. Whether the district court erred when it issued a summary judgment decision, jury instructions, and a verdict form directing that

---

[2] Citations to "A-__" and "CA-__" are to the deferred Joint Appendix and Confidential Appendix. Citations to "E__" are to ECF numbers on the district court docket. Citations to "PX" are to Plaintiff's trial exhibits.

NASL's remaining Sherman Act claims (Counts 2–5) could succeed only if NASL proved a relevant market, and when it denied NASL's motion for a new trial on that basis.

3. Whether the district court abused its discretion and deprived NASL of a fair trial through the following evidentiary rulings, both individually and cumulatively:

a. excluding all evidence about USSF's McKinsey report;

b. excluding all evidence of USSF's proposed 2015 Standards;

c. permitting Defendants to play a video of collateral invocations of the Fifth Amendment 75 times by a witness beyond NASL's direction and control, and issuing an adverse-inference instruction based on those invocations.

4. Whether the district court erred in barring the jury from hearing testimony from NASL's damages expert based on the reasonable assumption that a settlement NASL reached with a company named Team Holdings—resolving NASL's disputed financial obligations to that company in the actual world—also would have occurred in the but-for world without Defendants' antitrust violations.

## STATEMENT OF THE CASE

NASL appeals from the judgment against it (A-3711) upon jury verdict in the Eastern District of New York (Gonzalez, J.), together with all orders, rulings, and findings merged into the Final Judgment, including the June 12, 2024 order partly granting and partly denying the parties' summary judgment and *Daubert* motions (A-326) and the May 6, 2025 order denying NASL's motion for a new trial under Rule 59 (A-3722).

### A.    Factual Background

USSF is a private membership organization affiliated with the Fédération Internationale de Football Association ("FIFA"), an international organizing body for soccer.  A-986; A-1145–46.  USSF's members include men's professional soccer leagues like MLS, NASL, and the United Soccer League ("USL"), which are actual and potential competitors of one another, as well as other soccer organizations.  A-986; A-1188–89.

USSF determines whether to certify U.S. professional leagues in D1, Division 2 ("D2"), or Division 3 based on Standards that USSF first adopted in 1995 and revised in 2008, 2010, and 2014—a process known

8

as "sanctioning."[3]  For each Division, the Standards set forth requirements that a league must satisfy to be certified by USSF on behalf of FIFA.[4]  Noncertified leagues and their players are excluded from all international competitions sponsored by FIFA, including the World Cup.  A-986–87.  Being certified in a higher Division is highly advantageous for attracting team owners, players, and sponsors.  *Id.*

The Standards are an agreement adopted by vote of the USSF Board, which consists of representatives of USSF member organizations like MLS, among others.  A-3201; A-3217.  Professional leagues certified by USSF, such as MLS, NASL, and USL, were all required to agree to abide by the Standards.  A-986–87; A-3201.

MLS was founded by USSF officials and was certified by USSF as the sole D1 league in 1995.[5]  From 1995 until 2009, USSF did not require MLS to demonstrate compliance with the D1 Standards, even

---

[3] A-986–87; CA-953; A-2542; A-2546; A-2551.

[4] A-987; CA-953; A-2542; A-2546; A-2551.

[5] A-987; A-1089; A-1144; A-1156; A-2839–40; A-2842–43.

though USSF knew MLS did not comply with the Standards, which were a barrier to entry designed to protect MLS from competition.[6]

NASL was founded as a new league in 2009 and initially was certified in D2, but ultimately sought to compete with MLS in D1. USSF responded by heightening the Standards and starting to enforce them against NASL. From NASL's first season in 2011 through its last in 2017, USSF required NASL annually to demonstrate its compliance with the Standards or seek a "waiver"—a decision by the USSF Board to grant certification without full compliance.[7] During that period, USSF also granted repeated waivers to MLS, even though MLS had had over fourteen years to come into compliance with the D1 Standards.[8]

NASL grew rapidly as a D2 league after it started play in 2011, and it was close to satisfying most of the D1 Standards by the time the 2014 season was approaching. A-993–1000. This would have allowed NASL to apply for a D1 certification—a designation that, since 1995,

---

[6] A-1088–89; A-1094–99; A-1153–55; A-1160–61; A-1181; A-3307; A-2481; A-2844–45; A-2848; A-2865–70.

[7] A-1156–58; A-1953.

[8] A-1153–54; A-1158–60; A-1167–69; A-2481.

had been possessed exclusively by MLS, the league founded by USSF officials that became USSF's business partner. A-1091–92; A-1164–65; A-1178. Indeed, USSF was financially dependent on MLS, whose marketing company, Soccer United Marketing, provided USSF a majority of its revenues.[9]

To protect MLS from D1 competition, USSF agreed with its members to heighten several D1 Standards in 2014 so that NASL no longer could satisfy them. A-999–1000; A-1151–53; A-2110. These changes originated with Sunil Gulati—USSF's then-President, who simultaneously was a top executive for an MLS team, representing it at MLS Board meetings—as well as USSF staff working under Gulati's direction.[10] Gulati and his staff also asked the USSF Board to adopt these Standards, and Gulati himself directed the vote to adopt them without substantive deliberations. A-2109–10.

---

[9] A-1091–92; A-1164–66; A-1246; A-1252–60; A-1796; A-1821; A-2038; A-2064; A-2514; A-3288–89; A-3305; A-3310; A-3317; PX612.

[10] CA-1609; A-2067; A-2083; A-2085; A-2542; A-2812–18; A-1144–45; A-1147; A-1153–54; A-1165; A-1249.

11

At the preliminary-injunction stage, the district court accepted USSF's argument that since the non-MLS-affiliated members of the USSF Board had to vote to adopt the Standards, that provided a disinterested check against USSF agreeing to heighten the Standards to protect MLS. A-187–89; A-119. But discovery uncovered the opposite. USSF decision-making was dominated by Gulati and MLS. This was revealed in quotes from *USSF's own Board members*, in a USSF-commissioned report by McKinsey. As described in Judge Cogan's summary judgment decision (A-375–76):

> [A] report prepared by McKinsey Consulting in connection with its work to improve U.S. Soccer's board governance contained multiple statements from board members indicating MLS's dominance, including: "**MLS has a stranglehold of U.S. Soccer**"; "**It's not clear Sunil [Gulati] needs the Board. Some decisions are made outside the Board entirely**"; and "**We go to meetings to rubber stamp things.**"

As quoted in the McKinsey report, USSF Board members also stated: "We go to board meetings, they come in and tell us what to do and we leave"; "The Board is seen as a necessary evil"; and "A smaller group of the board is involved in the discussions and decision making

12

informally and we just get informed."[11]  As Judge Cogan concluded, "the information [in the report] is **highly relevant to the central issue of concerted action** and factored into the Court's summary judgment decision," and its "**statements are admissible**." A-376 & n.10; A-385.

In January 2015, NASL informed USSF of its plans to apply for a D1 sanction.  *Within two days*, USSF announced that it would be increasing the D1 Standards again—just a year after the last increase. CA-1101–02.  Then, after NASL applied for a D1 sanction in May 2015, USSF responded weeks later by circulating a proposed set of more stringent Standards, which would have put a D1 sanction far out of reach for NASL, and which USSF abandoned only after NASL's counsel warned that it would violate antitrust law.  CA-961; CA-1282; A-3234–35.

In March 2016, the USSF Board denied NASL's D1 application because there were two Standards requirements that NASL did not satisfy.  A-1004–06; A-2610–11.  USSF stated that its Board "considered whether a waiver could be granted" but decided not to do so based on

_____

[11] E457-1 at 14; CA-1410; CA-1413; CA-1416; CA-1419; CA-1424.

the Standards' "stadia size requirement." A-2286. In reality, the Board simply followed Gulati's direction to deny NASL's application. A-1170–71; A-2251–52. By contrast, USSF certified its business partner MLS in D1 with waivers every year from 2009 through 2016 (A-1158), after not even requiring MLS to seek waivers for its noncompliance from 1995 to 2009 (*supra* 9–10). The denial of D1 certification excluded NASL from D1 competition and caused it serious injury. A-1006–07.

In September 2017, the USSF Board denied NASL's request to renew its D2 certification, with Gulati stating that NASL should be denied the two waivers from the Standards it required.[12] At the same time, the USSF Board agreed with Gulati to maintain the D2 sanction of an MLS-affiliated league, USL, even though USL required 21 waivers from the Standards at that time.[13] This included eight waivers from the Standards' stadium-size requirements (A-3186), after USSF had refused to grant NASL *any* stadium-size waivers just a year earlier (A-1218).

---

[12] A-1015–20; A-1177–80; A-2476–79; A-2497–510; A-2512.

[13] A-1019–20; A-1115; A-1180–85.

14

Without its D2 certification, NASL was forced to suspend its operations. A-1022–23; A-1185.

The end result of Defendants' anticompetitive promulgation and application of the Standards was that MLS' monopoly was protected from all D1 competition, and later, USL was granted a D2 monopoly. A-1428. No expert evidence of procompetitive effects from the Standards was offered by Defendants at trial.

## B. Proceedings Below

On summary judgment, Judge Cogan, who had been reassigned the case from Chief Judge Brodie, concluded that "the evidence plaintiff presents is strong" and largely denied Defendants' summary judgment and *Daubert* motions (A-376), with limited exceptions. The court dismissed NASL's Count 1 claim under Section 1, which challenged the Standards themselves as an agreement in unreasonable restraint of trade. The court reasoned that NASL only could have suffered an antitrust injury from "defendants' application of the Standards, not the Standards themselves." A-367–69; A-388.

15

The district court upheld NASL's other claims, but rejected NASL's argument that it could "directly establish[] anticompetitive harms" without proving a relevant market. A-377; CA-1553–56.

Further, under *Daubert*, the district court ordered NASL's damages expert, Dr. Williams, to reduce his damages estimate for presentation to the jury. Specifically, Dr. Williams was required to abandon a reasonable assumption that NASL's disputed financial obligations to another company, Team Holdings, would have been resolved through the same type of settlement in the but-for world as actually occurred in the real world. A-350–52.

The case then was reassigned to Judge Gonzalez. Judge Gonzalez granted motions *in limine* to exclude key NASL evidence, including the USSF-commissioned McKinsey report and USSF's 2015 proposal to heighten the Standards. A-485–92. The court also held that NASL would "not [be] permitted to argue that USSF decided to use a standards-based system to shield" MLS from competition, due to the dismissal of Count 1. A-412 & n.4.

Judge Gonzalez also denied NASL's motion under Rules 401 and 403 to exclude inflammatory evidence of irrelevant criminal activities

16

by former NASL team owner Traffic and its representative Aaron Davidson. A-413–16. These activities had nothing to do with NASL. Yet at trial, the court allowed Defendants to play a deposition video of Davidson invoking the Fifth Amendment *75 times*, and issued an adverse-inference evidentiary instruction against NASL based on those invocations. A-422–426; A-669–670; A-3033. NASL had cut its ties to Davidson and Traffic years before the deposition, and most of the questions at issue were about collateral topics with no meaningful relevance. A-1452–53; A-3033.

At trial, the district court made a series of jury-instruction and verdict-form errors that *required* NASL to prove a relevant market to prevail on any of its claims. This was incorrect. The case law holds that a Sherman Act Section 1 or 2 plaintiff can prevail by presenting direct evidence that a restraint has anticompetitive effects—such as higher prices or reduced output—without having to prove the bounds of a relevant market.

Contrary to precedent, and over NASL's objection, the district court gave the following jury instruction:

> If you conclude that Plaintiff's alleged markets are not relevant antitrust markets, you should find in

17

favor of Defendants. You should *not* go on to determine whether the alleged conduct has had an anticompetitive effect in some other market.[14]

The district court further rejected NASL's proposed jury instructions that would have allowed NASL to prevail without proving a relevant market under a Section 1 *per se* theory[15]—another way of proving a Section 1 claim that does not require proof of a relevant market. And the court rejected a proposed instruction from NASL stating that it could prevail through direct evidence of anticompetitive effects without proving a relevant market:

> Plaintiff may show substantial harm to competition in a relevant market in two ways. **Plaintiff may do so directly through proof of actual detrimental effects on competition, such as a reduction of output.**…Alternatively, Plaintiff may prove harm indirectly…Under the indirect approach, Plaintiff must show that the harm to competition occurred in an identified market, known as a relevant market.[16]

Moreover, after Judge Gonzalez stated that he would only accept instructions that required NASL to prove a relevant market,[17] he

---

[14] A-893; *cf.* A-783–93.

[15] A-556–64; *cf. generally* A-861.

[16] *Compare* A-783–93 *with* A-890–91.

[17] A-3792 (Court: "Forget about whether you agree that you need a question about relevant market. I think you need a question about

rejected NASL's proposed verdict form that would have asked the jury to determine whether NASL had proven that Defendants "participated in a conspiracy to unreasonably restrain trade in *a market* for top-tier or second-tier men's professional soccer leagues located in the United States and Canada." A-653. Instead, he issued a verdict form that required NASL to prove one of the specific markets it asserted—without allowing the jury to find a different market and assess whether NASL had shown harm to competition in that market. A-3700, A-3706.

Following the instructions and verdict form presented by the district court, the jury rejected all of NASL's claims, based solely upon its finding in the first two jury questions that NASL had not proven any of its claimed relevant markets. *Id.* NASL moved for a new trial based on the errors committed, which the court denied. A-3722.

## SUMMARY OF ARGUMENT

**First**, the district court erred when it dismissed Count 1, NASL's Section 1 challenge to the Standards themselves. This was based on its incorrect conclusion that NASL could suffer an antitrust injury only

relevant market, right. So I'm going to have a question about relevant market.").

19

from a discriminatory application of the Standards (challenged in Count 2).  A membership organization's rules limiting the competitive behavior of its members, like the Standards, can be challenged as an agreement in violation of Section 1 "in and of themselves."  *See Associated Press v. United States*, 326 U.S. 1, 11 (1945); *Relevent Sports v. USSF*, 61 F.4th 299, 303 (2d Cir. 2023).  Indeed, NASL added Count 1 in its amended complaint after this Court of Appeals specifically noted, during preliminary-injunction proceedings, that such a claim was viable.  *NASL v. USSF*, 883 F.3d 32, 41 (2d Cir. 2018).  A new trial on Count 1 is thus required.

Further, this Court should determine that a jury may find that Count 1 is subject to Section 1 liability under either *per se*, quick-look, or direct-effects analysis.  None of these approaches requires proof of a relevant market.  *Shields v. World Aquatics*, 2024 WL 4211477, at *3 (9th Cir. Sept. 17, 2024).  Indeed, the Supreme Court has held that where, as here, industry standards were set without safeguards preventing biased influence to protect a particular competitor, *per se* condemnation is warranted, without proof of a relevant market. *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656,

657–59 (1961); *see also Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 509 (1988).

**Second**, the district court similarly erred by requiring NASL to prove a relevant market to prevail on its other claims (Counts 2–5). NASL should have been permitted to seek to prove its remaining Section 1 claim (Count 2) through *per se* or quick-look analysis, or through "[d]irect evidence of anticompetitive effects" such as reduced output, increased prices, or decreased quality. *Ohio v. American Express* ("*AmEx*"), 585 U.S. 529, 543 & n.7 (2018). None of these requires proof of the relevant market's contours. Similarly, "relevant market definition is not a necessary component" of "monopolization and attempted monopolization claims" (Counts 4 and 5) where there is "direct evidence of monopoly power." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107–09 (2d Cir. 2002). And "a relevant market definition is not a necessary element of" conspiracy to monopolize either (Count 3). *IHS Dialysis Inc. v. Davita, Inc.*, 2013 WL 1309737, at *4 n.3 (S.D.N.Y. Mar. 31, 2013).

**Third**, the district court made three critical evidentiary errors which, separately and cumulatively, deprived NASL of a fair trial:

21

- The USSF-commissioned McKinsey report was incorrectly excluded by Judge Gonzalez. This report stating that the USSF Board's decision-making was dominated by MLS was highly relevant and admissible evidence of the claimed conspiracy and anticompetitive intent, as Judge Cogan correctly held at the summary judgment stage. A-376 & n.10; A-385.

- USSF's 2015 proposal to heighten the Standards, after learning that NASL would be applying for D1, was wrongly excluded as irrelevant by Judge Gonzalez. Previously, Judge Brodie had held that this proposal was among NASL's "*best*" evidence of the challenged conspiracy and the Standards' anticompetitive purpose. A-190.

- The court abused its discretion by admitting collateral video testimony showing an executive from a former NASL team owner, Traffic Sports, invoking the Fifth Amendment 75 times, based on criminal proceedings that had nothing to do with NASL. This is precisely the type of inflammatory evidence held to be "substantially more prejudicial and redundant than probative." *In re 650 Fifth Ave. & Related Props.*, 934 F.3d 147, 172 (2d Cir. 2019). And it was legal error to instruct the jury that it could draw an adverse inference against

22

NASL from these invocations. The executive invoking the Fifth was not associated with NASL at the time of his deposition. The questioning at issue largely was collateral and immaterial, and plainly was designed to smear NASL by association with irrelevant criminal conduct.

**Finally**, the district court abused its discretion by precluding NASL's damages expert from basing his D1 damages opinion on a reasonable fact assumption—that if NASL had been granted a D1 certification, it still would have entered into a settlement agreement extinguishing NASL's obligation to pay a company called Team Holdings a portion of NASL's team entry fees. NASL did so in the actual world, so it was reasonable for an expert to assume that such a settlement also would be reached in the "but-for" world for estimating damages. It is the role of the factfinder, not the court, to determine whether to credit such a reasonable, though disputed, fact assumption. The jury should have been permitted to "make a just and reasonable estimate of the damage" to NASL to avoid "enabl[ing] the wrongdoer to profit by his wrongdoing at the expense of his victim." *Zenith Radio Corp. v. Hazeltine Rsch.*, 395 U.S. 100, 124 (1969).

23

## STANDARDS OF REVIEW

An appellate court conducts a *de novo* review of a district court's grant of summary judgment. *Mujo v. Jani-King Int'l, Inc.*, 13 F.4th 204, 208 (2d Cir. 2021). The Court must resolve all ambiguities and draw all reasonable inferences against the summary judgment movant, construing the facts in the light most favorable to the non-movant. *Id.*

This Court also "review[s] challenges to a district court's jury instructions *de novo*" and will overturn a verdict "if (1) the instructions were erroneous, and (2) the error was prejudicial." *Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 147 (2d Cir. 2025). Similarly, "[t]he instructions for a verdict form are reviewed *de novo*," and the Court will "reverse on that basis" if the verdict form instructions were "erroneous" and "a party was prejudiced by the error." *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 167 (2d Cir. 2001).

This Court "review[s] for abuse of discretion a district court's evidentiary decisions, including its decision to exclude evidence that is subject to a motion in limine." *Tereshchenko v. Karimi*, 102 F.4th 111, 124 (2d Cir. 2024). Reversal is warranted "if an erroneous ruling

24

affected a party's substantial rights." *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005).

"A party is generally entitled to a new trial if the district court committed errors that were a 'clear abuse of discretion' that were 'clearly prejudicial to the outcome of the trial.'" *Id.* (quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 17 (2d Cir. 1996)). It is an abuse of discretion to deny a new trial where the "jury instructions gave a misleading impression or inadequate understanding of the law." *Restivo v. Hessemann*, 846 F.3d 547, 572 (2d Cir. 2017).

## ARGUMENT

### I. The district court committed reversible error by granting summary judgment against Count 1.

A plaintiff under Section 1 of the Sherman Act must show a "contract, combination, or conspiracy"—*i.e.*, "concerted action"—that results in an "unreasonable restraint of trade." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 191–93 (2010). Courts analyze Section 1 claims under three principal frameworks: (i) *per se* condemnation, which applies to certain types of restraints that "always or almost always tend to restrict competition and decrease output" (*AmEx*, 585 U.S. at 540–41); (ii) "quick-look" analysis, also known as the "abbreviated" rule of

25

reason, which applies when a "quick look" is enough to conclude that the restraint "threaten[s] to reduce output and raise prices" (*NCAA v. Alston*, 594 U.S. 69, 88–89 (2021)); and (iii) full rule of reason analysis, which requires a fact-based assessment of whether the restraints at issue harm competition. *AmEx*, 585 U.S. at 541–42. Harm to competition can be shown through "[d]irect evidence of anticompetitive effects" such as reduced output, increased prices, or decreased quality. *Id.* Or anticompetitive harm can be shown indirectly, with "proof of market power plus some evidence that the challenged restraint harms competition." *Id.*

Critically, a plaintiff need not define a relevant market under *per se* or quick-look analysis, or when there is direct evidence of anticompetitive effects from a "horizontal" restraint—that is, a restraint on how competitors or potential competitors compete with each other. *Id.* at 540–43 & n.7.

A. **The district court erred when it held that NASL could not prove antitrust injury from the Standards themselves.**

The district court dismissed NASL's Count 1 on summary judgment, holding that NASL could not show that "the Standards in

26

and of themselves have caused" NASL an antitrust injury because "NASL's claimed harms arose from the application of the Standards." A-367. This was legal error. To show that an unlawful restraint caused an antitrust injury, "[i]t is enough that the illegality is shown to be a material cause of the injury." *Zenith*, 395 U.S. at 114 & n.9; *In re Pub. Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012) (same).

Applying this principle, the Supreme Court has long recognized the validity of Section 1 challenges to membership organization rules that directly restrict the competitive activities of members, because those rules themselves are a cause of the injuries. *Associated Press*, 326 U.S. at 11–12 (rules "in and of themselves were contracts in restraint of commerce"; holding rules unlawful "*on their face*"); *Alston*, 594 U.S. at 80 (NCAA's agreed-upon "compensation limits on student-athletes" in and of themselves were unlawful); *Am. Needle v. NFL*, 560 U.S. at 187–88 (where plaintiff was denied a license pursuant to exclusivity rule, Section 1 challenge to that rule was permitted); *NCAA v. Bd. of Regents*, 468 U.S. 85, 99 (1984) (affirming judgment that NCAA's broadcast rules were Section 1 violation).

27

This Court, too, has held that rules and standards restricting the competitive activities of members of a private association like USSF may themselves be unreasonable restraints of trade. *See Relevent Sports v. USSF*, 61 F.4th at 303–04 (Section 1 claim valid against FIFA's "2018 Policy itself," which prevented USSF from authorizing certain games played by foreign soccer leagues in the United States); *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 69 (2d Cir. 1988) (antitrust standing to challenge both the anticompetitive agreement itself and, "for essentially the same reasons," the sports association's anticompetitive decisions under that agreement).

Indeed, during the preliminary-injunction phase, this Court recognized that NASL could assert a Section 1 challenge to USSF's "Standards themselves—in totality—as violative of the antitrust laws." *NASL*, 883 F.3d at 41. NASL subsequently added that claim as Count 1. A-214; A-233; A-300–303.

Here, NASL presented evidence on summary judgment that the Standards themselves were barriers to entry that had the anticompetitive effect of protecting MLS from competition, while raising prices and reducing output, quality, and consumer choice. *Infra* 38 &

28

nn.22–26. Further, USSF's own formal notices to NASL of its D1 and D2 certification denials stated that the Standards themselves led to those denials. A-2286; A-2512. That evidence is all NASL needed to show that the Standards caused it an antitrust injury. *Zenith*, 395 U.S. at 114 & n.9; *In re Pub. Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012). The district court thus erred in holding that NASL had failed to show any "antitrust injury the Standards in and of themselves have caused," and in dismissing Count 1 on this basis. A-367.

Based on this erroneous holding, the court precluded NASL from presenting evidence at trial that the Standards themselves were anticompetitive, stating that such evidence would have "limited, if any, probative value" with Count 1 dismissed. A-411–12 & n.4; *infra*, Sections III.A–B. Had NASL been given an opportunity to try Count 1, NASL would have presented expert and other evidence that the Standards themselves were anticompetitive. They protected MLS from competition by erecting unreasonable barriers to entry and, in doing so, caused antitrust injury to NASL. CA-502–34; CA-467–74; CA-507–11; CA-526–35; *infra* notes 22–26.

29

**B.** **On remand, Count 1 can be proven either through *per se* liability, quick-look analysis, or direct evidence of anticompetitive effects.**

A jury verdict rejecting NASL's relevant markets would not have precluded NASL from prevailing on Count 1, challenging the Standards themselves as an agreement in unreasonable restraint of trade under Section 1. On remand, the Standards can be proven unreasonable by showing that *per se* or quick-look analysis is warranted, or showing anticompetitive harms directly under the rule of reason—none of which requires proof of a relevant market. *Shields*, 2024 WL 4211477, at *1–3 (reversing summary judgment and holding that sports association rules could be unlawful based on *per se* or direct-evidence analysis without proof of relevant market). Only if these proof methods fail does it become necessary to show anticompetitive harm indirectly by proving a relevant market in which the defendant has market power. *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) ("[A]n inquiry into market power…is but a surrogate for detrimental effects") (citing 7 P. Areeda, Antitrust Law ¶ 1511, at 429 (1986)).

The Supreme Court repeatedly has recognized that biased standard-setting and standards warrant *per se* condemnation. To be

30

sure, full rule of reason analysis may be warranted where an organization's standards are set "based on the merits of objective expert judgments and through procedures that prevent the standard-setting process from being biased by members with economic interests in stifling product competition." *Allied Tube*, 486 U.S. at 500–01. But where, as here, the standard-setting process lacks safeguards to prevent the standards from being formulated to favor particular competitors, standard setting has "a serious potential for anticompetitive harm" (*id.*), and "no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." *Ind. Fed'n of Dentists*, 476 U.S. at 459 (quoting *Nat'l Soc'y Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978)); *Hydrolevel Corp. v. Am. Soc'y of Mech. Eng'rs., Inc.*, 635 F.2d 118, 121–24 (2d Cir. 1980), *aff'd*, 456 U.S. 556 (1982) (Section 1 liability where ASME official employed by competitor "had helped draft" the standards-related document that resulted in plaintiff being noncompliant with ASME standards); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 775 (2d Cir. 2016) (*per se* rule for "circumvent[ing] the LIBOR-setting rules"); *infra*, Section II.A.

31

Here, NASL can prove that the Standards themselves should be subject to *per se* or quick-look condemnation without proof of a relevant market, because the evidence will demonstrate that USSF had no guardrails preventing the Standards from being promulgated with the anticompetitive purpose and effect of protecting MLS from competition. CA-1597; CA-1599–604.

For example, the evidence shows that USSF President Gulati induced USSF to raise the D1 Standards while he was simultaneously working as a top representative of the New England MLS team.[18] Further, the Standards were not the product of objective expert analysis.[19] Rather, Gulati and his staff overrode the views of USSF's expert task force that the Standards' revisions would unreasonably restrict competition.[20]

---

[18] CA-1594–95; CA-1604–07; E294 ¶¶ 28–32, 60–61, 70; CA-1147; CA-1171; CA-1205; CA-1181–82; CA-1198–200; CA-944; CA-1068–69.

[19] CA-1354; CA-1367–71; CA-1374–94; CA-1400–05; CA-1241–42.

[20] CA-1608–13; CA-1309–11; CA-1313; CA-1166; CA-1337–38; CA-1341–42; CA-1347–48; CA-1331–34.

On remand, the jury should also be instructed to consider whether, alternatively, NASL can prove a rule of reason violation through direct evidence of the Standards' anticompetitive effects, as a horizontal restraint blocking competitive entry and protecting MLS. *AmEx*, 585 U.S. at 543 & n.7; *Shields*, 2024 WL 4211477, at *3. As discussed in Section II, *infra*, the jury does not need to find what the relevant market is, when the plaintiff shows anticompetitive effects from a restraint on horizontal competition directly. NASL also will be able to prove that the Standards had no procompetitive justifications; and that, if there were any justifications, they could be achieved through substantially less restrictive alternatives. CA-1604–07; CA-1609; CA-1628; CA-269; CA-271; CA-531–35 & n.273; CA-1181–82 (MLS founding owner testifying that "MLS was able to run its league effectively by setting its own standards…It is not something that ever crossed our minds, that USSF needed to step in to help us improve our standards").

## II. The district court committed reversible error by requiring NASL to prove a relevant market to prevail on Counts 2 through 5.

### A. NASL's Section 1 claim under Count 2 did not require proof of the relevant market.

Count 2 challenges Defendants' overarching conspiracy to enforce the Standards in a discriminatory manner to protect MLS from competition. There were two separate grounds on which NASL should have been given the opportunity to prevail on this Section 1 claim. Neither requires NASL to prove a relevant market.

First, NASL should have been permitted to seek to prove Count 2 under a *per se* theory for similar reasons to Count 1. *Supra* Section I.B. "Concerted efforts to *enforce*…standards face more rigorous antitrust scrutiny." *Allied Tube*, 486 U.S. at 501 & n.6. *Per se* analysis applies where, as here, a membership organization's standards were enforced in a discriminatory manner to harm one member (NASL) and give an anticompetitive advantage to another member (MLS). *E.g.*, *Radiant Burners*, 364 U.S. at 657–59 (*per se* rule applicable, where organization's denial of "seal of approval" was "not based on 'objective standards,' but [] influenced by respondents, some of whom are in competition with petitioner"); *Silver v. N.Y. Stock Exch.*, 373 U.S. 341,

34

347, 364 (1963) (*per se* analysis applies where an organization's collective standards setting is "taken without according fair procedures"); *see also Blanksteen v. N.Y. Mercantile Exch.*, 879 F. Supp. 363, 369 (S.D.N.Y. 1995) (under *Silver*, "no justification exists for self-regulatory, anti-competitive action taken without affording fair procedures"). NASL was entitled to argue to the jury that USSF's differing treatment of NASL versus MLS and USL warrants *per se* analysis. *Supra* 9–15. And *per se* analysis does not require proof of a relevant market. *FTC v. Super. Ct. Trial Laws. Ass'n*, 493 U.S. 411, 432–33 & n.15 (1990).

Second, even if the jury did not find the factual predicates for applying *per se* analysis, there is no "'need to precisely define the relevant market,'" when a rule of reason plaintiff can show that "'horizontal restraints had an adverse effect on competition'" through direct evidence of anticompetitive effects such as reduced output, increased prices, or decreased quality. *AmEx*, 585 U.S. at 542–43 & n.7; *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 & n.11 (2d Cir. 2021) (same).

As the Supreme Court held in *Indiana Federation of Dentists*:

35

> Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects.…**[T]he finding of actual, sustained adverse effects on competition…is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis**.

476 U.S. 447, 460–61 (1986) (punctuation omitted).

The district court thus should have charged the jury that NASL was not required to prove a relevant market if it instead presented direct evidence of anticompetitive effects from the discriminatory application of the Standards. *E.g.*, *Shields*, 2024 WL 4211477, at *3 ("Even without a viable market definition, however, Plaintiffs have raised a triable dispute under the rule of reason through direct evidence of anticompetitive effects."); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (finding "sufficient proof of actual anticompetitive effects that no more elaborate market analysis was necessary"); *B&R Supermarket, Inc. v. Visa Inc.*, 2024 WL 4252031, at *6 & n.11 (E.D.N.Y. Sept. 20, 2024) (market definition unnecessary where

36

anticompetitive effects were shown directly); *In re Set-Top Cable Television Box Antitrust Litig.*, 2011 WL 1432036, at *11 (S.D.N.Y. Apr. 8, 2011), *aff'd*, 836 F.3d 137 (2d Cir. 2016) (same); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514, 520–22 (E.D.N.Y. 2005), *aff'd*, 604 F.3d 98 (2d Cir. 2010) (same).[21] By instructing the opposite—that a relevant market was an essential, gating prerequisite to each of Plaintiff's antitrust claims (*supra* 17–18)—the district court committed reversible error.

The district court incorrectly held that "proof of a relevant market was required under the rule of reason" in all cases (A-3733), quoting *AmEx*'s statement that "'[t]he rule of reason requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition.'" 585 U.S. at 541. But that does not mean the jury must find the relevant market. *AmEx* explicitly states that it is *not* necessary to "define the relevant market" where the plaintiff shows that "horizontal restraints had an adverse effect on competition." *Id.* at 543 & n.7.

---

[21] *Accord* Areeda & Hovenkamp, Antitrust Law (CCH) 1808 ("[W]hen power is sought to be proven by direct effects…no relevant market need be defined in the first place.").

At trial (and on summary judgment), NASL made the necessary direct showing of anticompetitive effects from USSF's discriminatory application of the Standards in concert with MLS and USL, which excluded competition from NASL and other leagues,[22] reduced output of D1 and D2 leagues and teams,[23] reduced their quality,[24] reduced consumer choice,[25] and increased prices for D1 and D2 expansion teams.[26] *See also* CA-1538–40; CA-1554–56 (summarizing anticompetitive harms).

---

[22] A-1000; A-1004–05; A-1013; A-2701–02; A-2711–13; A-2715–16; A-2744–45; A-2750–51; A-2753–54; A-2763–64; A-2772–81; A-2996; A-3009; A-2842–43; A-2869–70; CA-953; A-2542; A-2546; A-2551.

[23] A-1427–28; A-3178; CA-1228; A-3192; CA-180–81; E295-1 at 118–20; CA-990–91; CA-996–98; CA-1045–49; A-2975–77; A-2900–02.

[24] CA-164; CA-229; CA-1260; CA-1262; CA-1296.

[25] A-2102–03; A-2329–30; A-3093; A-3122; A-3134; A-3176–77; CA-1291–93; CA-989; CA-1043; E295-1 at 7–8, 33, 43, 60–62, 84, 120; CA-470–71; A-2876–77.

[26] A-1428–29; A-1024; CA-292; CA-243; C-245; CA-248; CA-213; A-2998–3000; E275-60; E275-61.

38

Further, when a sports organization like USSF adopts and applies rules restraining actual or potential competition between its members, like MLS, USL, and NASL, that is a horizontal restraint, even though the organization has a vertical relationship with its members. *E.g.*, *NCAA v. Alston*, 594 U.S. 69, 86 (2021) (NCAA's rules limiting athlete compensation were "horizontal" restraint because they limited competition among member schools); *Bd. of Regents*, 468 U.S. at 99 (NCAA rules that "prevent[ed] member institutions from competing against each other" were "horizontal restraint"); *United States v. Visa USA, Inc.*, 344 F.3d 229, 242–43 (2d Cir. 2003) ("restrictive exclusivity provision" for Visa's member businesses was "horizontal restraint"); *see also United States v. Apple, Inc.*, 791 F.3d 290, 324 (2d Cir. 2015) ("A horizontal conspiracy can use vertical agreements to facilitate coordination."). Indeed, as this Court recently held in another case against USSF, when "leagues…have…agreed to abide by the will of the

39

association[],” “[t]hat is enough” to establish a “horizontal” restraint. *Relevent Sports*, 61 F.4th at 307–09.

> **B.     NASL's Section 2 claims for monopolization and attempted monopolization (Counts 4 and 5) also did not require proof of a relevant market.**

It was further reversible error for the district court to instruct the jury that NASL had to prove the relevant market to prevail on its monopolization and attempted monopolization claims under Section 2. Monopolization requires proof of monopoly power, while attempted monopolization requires a dangerous probability of achieving monopoly power.  *Volvo*, 857 F.2d at 73–74.  But neither claim requires proof of the relevant market, because monopoly power “‘can be proven directly through evidence of control over prices or the exclusion of competition.’” *Geneva Pharms. Tech. v. Barr Lab's Inc.*, 386 F.3d 485, 500 (2d Cir. 2004) (quoting *Tops Mkts. v. Quality Mkts.*, 142 F.3d 90, 98 (2d Cir. 1998)).

The law in this Circuit is clear that “relevant market definition is not a necessary component” of “monopolization and attempted monopolization claims” where there is “direct evidence of monopoly power,” such as the “ability to control prices or exclude competition.”

40

*PepsiCo*, 315 F.3d at 107–09; *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at \*35 (S.D.N.Y. Aug. 29, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016) (same). Rather, much like in the Section 1 context, a relevant-market definition "simply serves as a surrogate for market power" when there is no "direct measurement of a defendant's ability to control prices or exclude competition." *PepsiCo*, 315 F.3d at 107–08; *accord Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007) (definition of relevant market not necessary where monopoly power is proven directly); *Re/Max Int'l v. Realty One*, 173 F.3d 995, 1016–20 (6th Cir. 1999) (same).

In its order denying NASL's motion for a new trial, the district court incorrectly held that "proof of a market is needed for *any* Section 2 claim." A-3739. The court concluded that *PepsiCo* and this Circuit's other contrary precedents were all overruled by *Heerwagen v. Clear Channel*, 435 F.3d 219 (2d Cir. 2006), and that the many later decisions cited above were incorrect.

But *Heerwagen* never said it was overruling the direct-evidence precedent; rather, it reaffirmed that "[m]onopoly power '*may be proven directly* by evidence of the control of prices or the exclusion of

41

competition.'" *Id.* at 227. The district court focused on *Heerwagen*'s statement that a "plaintiff cannot escape proving her claims *with reference to* a particular market even if she intends to proffer direct evidence." *Id.* at 229. But as later explained in *Shak v. JPMorgan*, this just meant that a monopolization plaintiff must make "'reference to a particular market'" to "situate [the claimed monopoly] power" in the marketplace—as NASL did here[27]—not that the jury must find that relevant market as a claim element. *Shak v. JPMorgan Chase*, 156 F. Supp. 3d 462, 481, 480–86 (S.D.N.Y. 2016) (quoting *Aluminum Warehousing*, 2014 WL 4277510, at *35) (upholding Section 2 claim based on "direct evidence of anticompetitive effects" despite "complete absence of adequate pleadings...defining the market").

Defendants below incorrectly cited *Spectrum Sports v. McQuillan* to argue that monopolization and attempted monopolization claims always require proof of a relevant market. E547 at 9–10. But *Spectrum Sports* just stated that a plaintiff must offer proof of "*market power* in a relevant market" (for monopolization) or a "dangerous probability" of achieving such power (for attempted monopolization). 506 U.S. 447,

---

[27] A-1422–26 (2125:2–2139:17); E295-1 at 5–6.

457–59 (1993).[28]  And such power can be proven through direct evidence of the ability to raise prices or exclude competitors, as this Circuit has held repeatedly since *Spectrum Sports.*  *Supra* 40–42.

NASL introduced direct evidence of MLS' monopoly power to raise prices for teams.  *Supra* note 26.  NASL also introduced direct evidence of MLS's power to exclude competition from other leagues by obtaining an exclusive D1 sanction, which barred competitive entry by others.  *Supra* 9–11, 38 & n.22.

### C.    NASL's claim for conspiracy to monopolize (Count 3) did not require proof of a relevant market.

A conspiracy to monopolize requires proof of concerted action with the specific intent to achieve a monopoly and overt acts in furtherance of that goal.  *Int'l Distrib. Ctrs. v. Walsh Trucking Co.*, 812 F.2d 786, 796 & n.8 (2d Cir. 1987).  "Once a plaintiff establishes a conspiracy with a specific intent to monopolize, proof of success or impending success is irrelevant."  *Id.*  In short, "Congress outlawed the conspiracy itself."  *Id.*

---

[28] Similarly, the other two cases on this point cited by Defendants— *United States v. Grinnell* and *Electronics Communications v. Toshiba*— just held that monopolization requires "power in the relevant market." 384 U.S. 563, 570–71 (1966); 129 F.3d 240, 242, 246 (2d Cir. 1997).

Accordingly, "a relevant market definition is not a necessary element of a Section 2 conspiracy claim." *IHS Dialysis*, 2013 WL 1309737, at \*4 n.3; *accord In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 382 (S.D.N.Y. 2016) ("[R]igorous proof of a relevant market…[is] not, in this Circuit, [an] essential element[] of conspiracy to monopolize"); *Emigra Grp. v. Fragomen*, 612 F. Supp. 2d 330, 363 (S.D.N.Y. 2009) (same).

This is because "specific intent to monopolize, and not monopoly power, is the essential element when a conspiracy to monopolize is involved." *Hudson Valley Asbestos v. Tougher Heating*, 510 F.2d 1140, 1144 (2d Cir. 1975); *United States v. Consol. Laundries*, 291 F.2d 563, 572–73 (2d Cir. 1961) (same). A party can commit "'a conspiracy to monopolize without ever having acquired the power to carry out the object of the conspiracy.'" *Am. Tobacco Co. v. United States*, 328 U.S. 781, 789 (1946) (citing *United States v. Shapiro*, 103 F.2d 775, 776–77 (2d Cir. 1939)).

Courts therefore hold that conspiracy to monopolize does not require proof of a relevant market. *E.g.*, *Am. Tobacco*, 328 U.S. at 789 (excluding relevant market from elements of conspiracy to monopolize);

44

*Volvo*, 857 F.2d at 73–74 (same); *P&L Dev. v. Gerber Prods.*, 715 F. Supp. 3d 435, 465 (E.D.N.Y. 2024) (same); *Charych v. Siriusware*, 2018 WL 4870906, at \*5 (E.D.N.Y. July 30, 2018), *aff'd*, 790 F. App'x 299 (2d Cir. 2019) (same); *Shak*, 156 F. Supp. 3d at 490–91 (same); *see also United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 396 & n.23 (1956) ("the scope of the market was not in issue" in "a conspiracy to monopolize" case).

The district court rejected this extensive case law, some from as recently as 2024, in erroneously concluding that "courts today consistently require relevant market definitions for *all* Section 2 claims." A-3735–36. To the contrary, this Court consistently has held that "where the charge is conspiracy to monopolize, the essential element is not the power, but the specific intent, to monopolize." *Consol. Laundries*, 291 F.2d at 573 & n.13; *accord Hudson Valley*, 510 F.2d at 1144; *N.E. Tel. Co. v. AT&T*, 651 F.2d 76, 85 (2d Cir. 1981), *cert. denied*, 455 U.S. 943 (1982); *Belfiore v. N.Y. Times*, 826 F.2d 177, 183 (2d Cir. 1987).

The district court incorrectly concluded that conspiracy to monopolize requires proof of a relevant market because a single case—

45

*Consolidated Laundries*—cited some later-abrogated reasoning from the Supreme Court's 1947 *United States v. Yellow Cab* decision as *additional* support for its holding. A-3734–35. The cited passage from *Yellow Cab* stated that the amount of trade impacted by a restraint was "immaterial in determining whether a violation of the Sherman Act" had occurred, because Section 2 makes it unlawful to "monopolize 'any part' of interstate commerce." 332 U.S. 218, 225 (1947). Subsequently, the Supreme Court in *Spectrum Sports* declined to follow that reasoning from *Yellow Cab*, holding that an attempted-monopolization plaintiff must show a dangerous probability of monopolizing a relevant market and not just "any part" of commerce. 506 U.S. at 457. The district court concluded that this meant a conspiracy to monopolize plaintiff must always prove a specific relevant market. A-3734–38.

This conclusion was mistaken for three reasons. First, the *Spectrum Sports* opinion addressed the elements of attempted monopolization, not conspiracy to monopolize. 506 U.S. at 454–59. Second, *Spectrum Sports* did not even hold that an attempted-monopolization plaintiff must always prove the relevant market—just a

dangerous probability of monopolization. *Id.* And third, proof of a relevant market has never been a required element of conspiracy to monopolize. That rule has its roots in the legal nature of conspiracy offenses, and the fact that it is unnecessary to prove that the conspiracy succeeded in achieving monopoly power (*Am. Tobacco*, 328 U.S. at 789; *Int'l Distrib.*, 812 F.2d at 796 & n.8; *Shapiro*, 103 F.2d at 776–77)—not the abrogated "any part" of commerce reasoning from *Yellow Cab.*

The district court cited two other Second Circuit decisions, but both cases are off point. Neither involved a conspiracy to monopolize, and both just held that the plaintiffs must show *harm to* "*competition within a relevant market*" (for a Section 1 claim) or "*power in the relevant market*" (for a monopolization claim)[29]—which NASL showed through direct evidence of anticompetitive effects without having to prove a relevant market. *Supra* 38 & nn.22–26.

---

[29] *See Regeneron Pharm. v. Novartis Pharma*, 96 F.4th 327, 338 (2d Cir. 2024); *Electronics Comm'cns*, 129 F.3d at 242, 246.

47

**D.** **The district court also committed error by requiring NASL to prove the specific relevant markets that it alleged.**

Even if it were correct to require the jury to find some relevant market, the district court erred by forcing the jury to choose between finding the exact relevant markets alleged by NASL and rejecting NASL's claims altogether. *Supra* 18–19.

"[I]t [i]s not necessary for the jury to accept absolutely either the [defendant's] or the plaintiff's market definitions. Instead, the critical question is whether the jury could have determined that…[the restraint at issue] harmed competition." *L.A. Mem'l Coliseum v. NFL*, 726 F.2d 1381, 1394 (9th Cir.), *cert. denied*, 469 U.S. 990 (1984). Accordingly, where the jury has "define[d] a [] market…broader than the market alleged by the" plaintiff, instructions should permit the jury to determine whether "defendants have the power to control prices or exclude competition in this broader market." *USFL v. NFL*, 842 F.2d 1335, 1362–67 (2d Cir. 1988); *accord Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 69 (2d Cir. 1984) (plaintiff could prevail under Section 2 by proving defendant "had monopoly power, *even if the relevant market was larger than [plaintiff] maintained*.").

48

It was error for Judge Gonzalez to prevent the jury from finding a relevant market that was broader than NASL's claimed markets. NASL proposed a verdict form that would have permitted this, but it was rejected. *Supra* 18–19.

### E. NASL did not waive or forfeit its relevant-market arguments.

In denying NASL's Rule 59 motion, Judge Gonzalez stated that NASL did not argue with "clarity" that it "could prevail without proving its relevant markets" until after trial, and that NASL therefore had waived its right to object. This ruling not only was incorrect on the facts—NASL repeatedly had argued that it could prevail without proving a relevant market—it was legal error.

### 1. NASL did not commit waiver.

To begin with, even if NASL had failed to argue earlier that proof of a relevant market was unnecessary, that would not constitute waiver. "Waiver is the '*intentional* relinquishment of a known right,'" and "'[t]he conduct said to constitute a waiver must be clear and unequivocal, as waivers are never to be lightly inferred.'" *U.S. D.I.D. Corp. v. Windstream Commc'ns*, 775 F.3d 128, 136 (2d Cir. 2014) (quoting *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999); *Mooney v.*

49

*City of N.Y.*, 219 F.3d 123, 131 (2d Cir. 2000)). Waiver occurs "only where the parties were aware of their rights and made the *conscious choice*, for whatever reason, to waive them." *Id.*

In contrast, "[w]here a litigant's action or inaction is deemed to incur the consequence of loss of a right…the term '*forfeiture'* is more appropriate." *Doe v. Trump Corp.*, 6 F.4th 400, 410 n.6 (2d Cir. 2021) (quoting *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999)). "Mere forfeiture, as opposed to waiver, does not extinguish an 'error'" that is "plain" and "prejudicial." *United States v. Olano*, 507 U.S. 725, 733 (1993).

Because it was plainly contrary to law and prejudicial that the district court required the jury to reject NASL's claims unless it proved its asserted relevant markets, reversal is warranted on plain-error grounds, irrespective of whether any forfeiture occurred.

### 2. NASL did not commit a forfeiture.

In any event, NASL did not commit any forfeiture with respect to its relevant-market arguments. On the contrary, NASL repeatedly argued that it could prevail without proving a relevant market, even after losing that argument.

First, NASL argued this on summary judgment, and the district court rejected it, holding that "the determination of the relevant market is necessary to analyze antitrust claims under the rule of reason." *Supra* 16; A-377.  At that point, NASL did not have to take any further steps "to preserve for appellate review a purely legal issue resolved at summary judgment." *Dupree v. Younger*, 598 U.S. 729, 735–36 (2023).

Second, NASL argued in proposed jury instructions that it need not prove a relevant market.  *Supra* 18.  Defendants responded that the "[c]ourt already rejected" NASL's "argument that 'a direct showing of anticompetitive harm can obviate the need for an inquiry into relevant markets.'"  A-784.  And the district court again rejected this argument by NASL, after warning it would "not entertain repetitive objections to portions of…instructions."  *Supra* 18; E499 (docket entry).

At this point, there unequivocally was "no need to reiterate [NASL's] objection" yet again, when NASL's "position previously ha[d] been made clear to the trial judge and it [wa]s plain that a further objection would be unavailing." *E.R. Squibb*, 241 F.3d at 167.  The reason parties are required to object to jury instructions is "'to allow the

51

trial court an opportunity to cure any defects in the instructions before sending the jury to deliberate,' not to multiply redundant motions." *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 200–01 (2d Cir. 2004) (quoting *Girden v. Sandals Int'l*, 262 F.3d 195, 202 (2d Cir. 2001)).

Where, as here, "a party makes its position clear…and the trial judge is not persuaded," "further attempt to object need not be undertaken because it would be without any reasonable possibility that the trial court would change its mind." *Girden*, 262 F.3d at 202 (plaintiff "twice argued her point to the district court, which rejected it"); *Thornley v. Penton Publ'g*, 104 F.3d 26, 30 (2d Cir. 1997) (no further objection necessary after party "argued its position to the district judge, who rejected it").

### 3. There was no waiver or forfeiture based on NASL's statements at a pretrial conference.

The district court also erred by finding waiver based on statements made by NASL's counsel at the December 2024 final pretrial conference. There, the parties and court were discussing whether, to find a relevant market, it is necessary for (i) each juror to find any market, or (ii) all jurors unanimously to find at least one market that was the same. A-3780; A-3790–91. NASL's counsel

52

acknowledged that, *to prove a relevant market,* "the jury must unanimously find that there is a relevant market." *Id.*

This was not a statement about whether a relevant market had to be proven in the first place—the district court already had held that that would be required. *Supra* 16–18. And this certainly was not an "intentional relinquishment" of NASL's right to appeal that prior relevant-market holding, as is required for waiver. *U.S. D.I.D.*, 775 F.3d at 136 (party did not waive right by stating "no objection" at a hearing). As this Court has explained:

> **[A] plaintiff's failure later to repeat the objection…[i]s not a "waiver" of the ruling against him; he ha[s] taken his position, ha[s] lost, and he [i]s free thereafter to win a verdict if he could within the narrower borders of the case that the judge ha[s] laid down for him.**…The notion is wholly untenable that in order to protect himself against an imputed surrender, a party must reassert what has been overruled every time the occasion comes up again.

*Keen v. Overseas Tankship Corp.*, 194 F.2d 515, 519 (2d Cir. 1952); *see also Douglas v. Alabama*, 380 U.S. 415, 422 (1965) ("No legitimate state interest would have been served by requiring repetition of a patently futile objection, already thrice rejected, in a situation in which repeated objection might well affront the court or prejudice the jury beyond

53

repair."); *Virgin Atl. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) ("'[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'").

## III. The district court abused its discretion in three critical evidentiary rulings which deprived NASL of a fair trial.

Judge Gonzalez made three serious evidentiary errors requiring a new trial, both individually and cumulatively: (i) the exclusion of the USSF-commissioned McKinsey report; (ii) the exclusion of the 2015 proposed Standards; and (iii) the admission of video deposition testimony by a Traffic Sports executive invoking the Fifth Amendment 75 times based on irrelevant criminal conduct that did not involve NASL, followed by a jury instruction permitting an adverse inference to be drawn against NASL from such invocations.

These errors should be corrected on this appeal, because it is likely that another appeal would be necessary if they were repeated at a new trial. *See United States v. Litvak*, 808 F.3d 160, 184–85 (2d Cir. 2015) ("[W]e proceed to address [evidentiary rulings] for purposes of judicial economy, as the same issues are likely to arise on remand."); *Palin v. N.Y. Times Co.*, 113 F.4th 245, 274 (2d Cir. 2024) ("[B]ecause a

54

new trial is already required, correcting the district court's errors now…will best conserve judicial resources.").  Any of these errors "would be sufficiently prejudicial to warrant a new trial," but their cumulative prejudicial effect is even greater.  *Sidibe v. Sutter Health*, 103 F.4th 675, 706 (9th Cir. 2024) ("Even if neither error alone justified reversal, however, it is 'not always' the case that '0 + 0 = 0,' because courts must 'consider the whole picture'"); *see also Malek v. Fed. Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993).

### A.     The McKinsey report

USSF commissioned a McKinsey report on its Board's governance. This is crucial evidence on a central issue in this case since preliminary-injunction proceedings.  At that stage, in assessing the issue of concerted action, Chief Judge Brodie found that USSF's conduct was "troubling" and there was "ample evidence of a conflict of interest" with MLS, but ultimately accepted USSF's representation, prior to any discovery, that its Board provided a disinterested check against USSF heightening the Standards to favor MLS.  A-187–89; A-119.

The McKinsey report—commissioned by USSF to review its Board governance—showed that USSF's representation was false.  The report

55

quotes numerous USSF Board members stating that the Board was in an MLS "stranglehold" and was a "rubber stamp" controlled by USSF President and MLS cofounder Sunil Gulati. *Supra* 12. Judge Cogan held on summary judgment that this report was "highly relevant" to proving NASL's claims and was "admissible." A-376 & n.10; A-385.

As Judge Cogan explained, "[t]he McKinsey report is a business record and falls into the hearsay exception," and "the U.S. Soccer employees' statements therein qualify as party-opponent admissions under Fed. R. Evid. 801(d)(2)." A-376 & n.10. In addition, the statements were "adopted by the report as support for its findings," and thus are admissible under the business record exception—*i.e.*, without being a separate hearsay layer. *Id.* (citing *Schering Corp. v. Pfizer*, 189 F.3d 218, 239 (2d Cir. 1999) (hearsay statements "summarized" in report were admissible party-opponent admissions, having been adopted by the report as support for its findings; "[A] party admission containing hearsay is admissible where…the admission draws inferences from the

56

underlying hearsay and thus manifest[s] an adoption or belief in its truth.")).[30]

It thus was inexplicable when Judge Gonzalez later ruled that the McKinsey report was "*precluded* by Judge Cogan's ruling." A-489. As support, Judge Gonzalez cited a separate part of Judge Cogan's order, which excluded testimony by a defense expert. That expert had "focuse[d] on irrelevant corporate law issues like the purported application of the Business Judgment Rule or the elements of a claim for breach of the duty of loyalty under Delaware law." A-361–62. In that part of the order, Judge Cogan excluded testimony about "defendants' compliance with corporate governance obligations under legal standards that exist separate and apart from the antitrust law." *Id.*

Judge Gonzalez erroneously interpreted this as a ruling that any evidence touching on "corporate governance issues" must be excluded, including the McKinsey report. A-489. But that interpretation is demonstrably incorrect, because Judge Cogan explicitly held that the McKinsey report was "admissible." A-376.

---

[30] *Accord Royal & Sun All. Ins. v. UPS Supply Chain Sols.*, 2011 WL 3874878, at \*12–13 (S.D.N.Y. Aug. 31, 2011).

Indeed, Judge Cogan held that the McKinsey report was "highly relevant" evidence of MLS' power to influence USSF Board decision-making and its history of exercising that power, which was critical circumstantial evidence in support of the claimed USSF-MLS concerted action. A375–76; A-385; *accord Simon-Whelan v. Andy Warhol Found.*, 2009 WL 1457177, at *5 (S.D.N.Y. May 26, 2009) (allegations of board domination and control supported antitrust claims); *Sitts v. Dairy Farmers of Am.*, 2020 WL 3467993 at *6 (D. Vt. June 24, 2020) (allowing expert to explain how conflicts of interest can motivate an antitrust conspiracy).

As the Supreme Court has recognized:

> [A] standard-setting organization…can be rife with opportunities for anticompetitive activity… [where its] officials are associated with members of the industries [it] regulate[s]…[S]ome may well view their positions…as an opportunity to benefit their employers.

*Hydrolevel*, 456 U.S. at 571 (upholding antitrust liability where two members of a standard-setting organization caused it to act against their competitor). USSF's McKinsey report was critical evidence showing that MLS and Gulati could, and frequently did, exercise undue influence over USSF and its Board. A-375–76 (McKinsey report was

58

evidence that "MLS had a significant degree of control over the U.S. Soccer Board's policymaking process"). This evidence was especially important because USSF argued to the jury that the claimed "independence" of its Board members was a reason not to find the claimed conspiracy between USSF and MLS.[31]

The district court's other stated grounds for excluding USSF's McKinsey report were improper judicial fact-finding. Judge Gonzalez held that the report was irrelevant because it was only "probative of general corporate governance issues facing U.S. Soccer" that did not focus specifically on the Standards and sanctioning. A-491. But it was up to the jury—not the court—to determine whether MLS's general dominance over USSF Board decision-making was evidence supporting NASL's claim that MLS' dominance caused the USSF Board to deny NASL D1 certification, and later D2 certification. *E.g.*, *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987) ("[T]he question of what weight should be assigned to competing permissible inferences remains within the province of the fact-finder."); *Hahn v. Or. Physicians' Serv.*, 868 F.2d

---

[31] *E.g.*, A-967; A-971; A-974; A-1189; A-1200–01; A-1416; A-1553; A-1562–63.

1022, 1030 (9th Cir. 1988) (doctors' general domination of physicians' organization supported concerted-action allegations of excluded podiatrists).

Judge Gonzalez also engaged in improper factfinding by ruling that one of the many important quotes from the McKinsey report—that "MLS has a stranglehold of U.S. soccer"—was irrelevant because it "appeared" to be referring to soccer in the United States rather than Defendant U.S. Soccer, based on McKinsey's use of a lowercase "s" in the word "soccer." A-490–91. This reasoning made no sense because the McKinsey report was quoting *oral statements* by USSF Board members, which are not lowercase or uppercase. Further, a statement by a USSF Board member that MLS had a "stranglehold of soccer in the U.S." would still be highly relevant evidence of MLS' influence over USSF, which the jury should have been permitted to consider.

Judge Gonzalez also stated that he was "not convinced that the statements [in the report] can be fairly attributed to U.S. Soccer board members…given that McKinsey's representative testified that it was not McKinsey's practice to transcribe completely and verbatim comments made in interviews." A-491–92. But *the report itself* describes these as

60

quotes from USSF Board members and uses quotation marks. CA-1410; CA-1413; CA-1416; CA-1419. A self-serving, post-complaint assertion that these quotes may not be accurate was, at best, a fact issue for the jury to evaluate—not a basis for excluding this critical evidence.[32]

Further, these USSF Board member statements in a USSF-commissioned report should have been admissible even if they were not exact quotes, because—as Judge Cogan held—they were "adopted by the report as support for its findings" and thus are admissible as a business record. A-376 n.10 (citing *Schering*, 189 F.3d at 239).

## B.    The 2015 proposed Standards.

USSF's proposed Standards from 2015 were a central part of NASL's conspiracy evidence, which Judge Gonzalez also wrongly excluded. After NASL notified USSF in January 2015 that it planned to seek a D1 sanction, *within two days*, USSF announced that it would be adopting heightened D1 Standards—despite having done so just a year earlier. CA-1101–02. Then, after NASL submitted its D1 application,

---

[32] *Cf. Gardner-Alfred v. Fed. Rsrv. Bank of N.Y.*, 2025 WL 1813025, at *13 (2d Cir. July 2, 2025) (quoting *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 86 (2d Cir. 2019)) (no triable issue of fact where "'record contradictions with [later] testimony [are] inescapable and unequivocal'").

61

USSF circulated new draft Standards, which it knew NASL could not satisfy. CA-1282; CA-961–62; CA-1284; E308 ¶¶ 81–85. It was only after NASL's counsel sent a letter warning of antitrust claims against the new 2015 Standards that USSF decided not to adopt them and to instead reject NASL's application under the existing 2014 Standards. CA-896.

At the preliminary-injunction stage, Chief Judge Brodie found that that the proposed 2015 Standards were the "*best support* [for] Plaintiff's argument of 'an escalation' of the [Standards] for the purpose of keeping MLS as the sole Division I league," and that "both the timing and the proffered reason are suspect." A190–91. By contrast, Judge Gonzalez held that evidence of the 2015 proposed Standards was irrelevant under Rule 401 for two erroneous reasons.

First, Judge Gonzalez noted that the proposed 2015 "standards were never adopted or applied to" NASL and concluded that they could not have caused any injury to NASL. A-485–87. The court cited *Warriors Sports v. NCAA* for the proposition that "proposed changes" to rules cannot "be challenged because they necessarily did not cause, nor did

they threaten to cause, any injury." *Id.*; 623 F.3d 281, 285 (6th Cir. 2010); A-3751–52. But this analysis missed the mark, because NASL sought to use the proposed 2015 Standards as evidence of USSF's anticompetitive and conspiratorial intent to protect MLS by excluding NASL—not to prove that the proposal caused NASL a separate antitrust injury.[33]

Courts repeatedly have found unadopted proposals to be relevant evidence to prove intent and conspiracy. *United States v. Pastore*, 2022 WL 2068434, at *3–4 (2d Cir. June 8, 2022) (defendant's unexecuted "proposal was relevant to establish his state of mind and intent" and "highly probative of his participation in [the alleged] conspiracy"); *Rochester Drug Co-Op. v. Mylan Inc.*, 2022 WL 1598377, at *8 (D. Minn. May 20, 2022) (draft proposals and agreements were relevant evidence of anticompetitive intent); *In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prods. Liab. Litig.,* 181 F. Supp. 3d 278, 296 (E.D. Pa. 2016) (draft documents "may still be relevant to show the defendants' knowledge, state of mind, motive, and/or intent").

---

[33] Later, in denying NASL's Rule 59 motion, the court acknowledged that "[t]hat is an accurate case-specific distinction." A-3751.

The Ninth Circuit's decision in *Sidibe v. Sutter Health* is on point. There, the district court excluded evidence of certain anticompetitive conduct because it would not have "caused [plaintiffs] harm during the damages period." 103 F.4th 675 (9th Cir. 2024). The appellate court reversed and admitted this evidence as "highly relevant" and "essential":

> [T]he history of the restraint and the reasons for its adoption are crucial factors under the rule of reason.…Evaluating a party's motives is particularly important when applying the rule of reason's "fact-specific assessment."

*Id.* at 692–93, 705.

Judge Gonzalez's other stated ground for excluding the 2015 proposed Standards was his belief that USSF "was meeting to discuss them before NASL submitted its D1 application" in May 2015. A-3751. But this ignores the critical fact that NASL already had told USSF of its intention to apply for a D1 sanction before that in *January* 2015. *Supra* 13.

### C. Fifth Amendment invocations of a Traffic executive.

Judge Gonzalez abused his discretion by allowing USSF to play a video of Traffic Sports executive Aaron Davidson taking the Fifth Amendment 75 times based on irrelevant criminal conduct unrelated to

NASL. He also erred legally by issuing an adverse-inference instruction against NASL on that basis.

Traffic was an international soccer company that owned an NASL team. A-992. In May 2015, Traffic and its representative on NASL's Board, Davidson, were charged with making bribes involving international soccer tournaments, which had nothing to do with NASL. A-1001–03. When NASL learned about those charges in May 2015, it took steps to remove Traffic and Davidson from the league. *Id.* The DOJ never contacted NASL about Traffic. *Id.*

Judge Gonzalez denied NASL's motion to exclude evidence concerning Traffic's criminal matters under Rules 401 and 403. His rationale was that being associated with Traffic might have caused some of NASL's injuries. But the court stated that "Defendants may not belabor the details of Davidson's and Traffic's conduct that led to their indictments and guilty pleas," and that "[t]he Court w[ould] not permit Defendants to cross this line at trial and attempt to use the indictments and guilty pleas as a smear tactic against NASL." A-415–16.

Despite these comments, the district court did the exact opposite at trial. Over NASL's objection, Judge Gonzalez permitted Defendants to

65

play deposition video of Davidson invoking the Fifth Amendment 75 times, based on criminal conduct by Traffic unrelated to NASL. The underlying questions largely were about trivial and ancillary issues, which had nothing to do with showing an alternate cause of NASL's injuries—for example, questions about Traffic's ownership percentage of Team Holdings, or a consultant's purported involvement in persuading a team to join NASL *several years* before it was denied D1 or D2 certification.[34] Even worse, Judge Gonzalez then gave the jury an instruction that they could draw any adverse inference they chose against NASL based on those Fifth Amendment invocations.[35]

It was an abuse of discretion for the court to let Defendants play video of Davidson's 75 Fifth invocations based on irrelevant criminal conduct. *See Woods v. START Treatment & Recovery Ctr.*, 864 F.3d 158, 170 (2d Cir. 2017). This was a smear tactic, and was exactly the type of "dramatic presentation" of Fifth Amendment testimony that this Court

---

[34] *See* E523 (NASL Objection Ltr.); A-1452–53; A-3043–61.

[35] A-877 (Instruction 12) (instructing jury to "consider any inference [they] may or may not choose to draw from a refusal to testify on Fifth Amendment grounds").

has held an abuse of discretion. *E.g.*, *In re 650 Fifth Ave. & Related Props.*, 934 F.3d 147, 172 (2d Cir. 2019) ("The videotapes…repeatedly put the Government's incriminating questions in the jurors' minds…Substantially less prejudicial and redundant alternatives were available, such as a stipulation or a scaled-back showing of the videotapes."). The resulting prejudice was made even worse because, on summation, defense counsel was permitted to argue that Davidson would have contradicted NASL's witnesses' denial of any knowledge of Traffic's criminal behavior if he had not taken the Fifth, while the court instructed the jury to disregard plaintiff counsel's argument that Davidson's invocations were on his counsel's instructions. A-1550; A-1577; A-1609.

Judge Gonzalez then committed legal error by granting Defendants an adverse-inference instruction based on Davidson's 75 Fifth Amendment invocations. *See Woods*, 864 F.3d at 170. NASL had severed its ties to both Davidson and Traffic years before his deposition (*supra* 65) and thus had no control over him when he invoked the Fifth (A-423).

67

Under *LiButti v. United States*, the factors governing whether an adverse inference can be drawn against a party because of a witness's Fifth Amendment invocation are: (i) the nature of the relationship; (ii) the degree of control over the nonparty witness; (iii) the compatibility of the interests of the party and the nonparty in the outcome of the litigation; and (iv) the role of the nonparty witness in the litigation. 107 F.3d 110, 123 (2d Cir. 1997). Importantly, this test considers the relationship between the party and the nonparty witness at the time of the Fifth Amendment invocation. *See, e.g., Abington Emerson Cap. v. Adkins*, 2021 WL 611998, at *22 (S.D. Ohio Jan. 22, 2021) (compiling cases) ("the relationship at the time" of testimony "is most relevant because it most accurately reflects the nature and degree of control the defendant has over the witness"); *In re Urethane Antitrust Litig.*, 2013 WL 100250, at *2 (D. Kan. Jan. 8, 2013) (no inference because "at the time they invoked the Fifth Amendment, these witnesses had no relationship to [defendant]"); *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 61 (D.D.C. 2007) (no adverse inference because "he pled the Fifth when he was not [party's] employee and [party] exercised no control over him").

68

All the *Libutti* factors weighed strongly against any adverse inference being permitted against NASL. Davidson's relationship with NASL was terminated in 2015, when NASL removed him as Traffic's representative on the NASL Board and removed Traffic as a team owner, long before Davidson's deposition in 2019. CA-1461–63; CA-1468. NASL had no control over Davidson in 2019 (CA-1474–75), and NASL winning the litigation would not advance Davidson's interests (CA-1482–83). Further, Defendants were able to play other testimony by Davidson at trial, which was far more relevant than his repeated invocations of the Fifth. *See, e.g.*, A-3035–43; A-3062–69.

It was legal error for Judge Gonzalez to instruct the jury that they could draw an adverse inference against NASL in these circumstances. *See Woods*, 864 F.3d at 170; *Carter-Wallace v. Hartz Mountain Indus.*, 1983 WL 1805, at *5–6 (S.D.N.Y. Apr. 13, 1983).

## IV. The district court's exclusion of Dr. Williams' "but-for" world damages assumption was an abuse of discretion.

Finally, to prevent repeated error on remand, this Court should reverse the district court's decision to exclude Dr. Williams' expert testimony based on the reasonable assumption that, in the "but-for"

69

world where NASL had been granted D1 certification in March 2016, NASL would have entered a settlement resolving its disputed debts to Team Holdings, similar to the actual settlement that NASL entered into in the real world. A-350. Because of this erroneous *Daubert* ruling, Dr. Williams was required to make a substantial reduction in his estimate of NASL's D1 damages. *Compare* CA-633 *and* CA-1492 ($356 million) *with* A-1468 ($48.4 million).

Team Holdings was a company with a disputed contractual interest in team entry fees received by NASL. CA-1495. In the actual world, NASL resolved that disputed obligation to Team Holdings by paying $5.1 million in a November 2016 settlement. *Id.* Dr. Williams made the reasonable assumption in his D1 damages methodology that in the "but-for" world where NASL received a D1 certification in March 2016, NASL would have entered into either (i) the same settlement or (ii) a similar but larger settlement, because NASL teams would be more valuable as members of a D1 league. Dr. Williams calculated damages for both settlement scenarios. E545-1 at 23; E286 at 18–19; CA-768–70.

Ruling upon a *Daubert* motion to exclude Dr. Williams' testimony, the district court incorrectly held that it was "too speculative" for Dr. Williams to assume that NASL would have settled its Team Holdings dispute in the but-for world—even though such a settlement happened in the real world. A-350–52. Instead, the court directed Dr. Williams to recalculate damages based on the assumption that NASL would have paid Team Holdings the full amount specified in a contractual formula, rather than settling this disputed obligation for a reduced amount. *Id.* This was legal error.

First, "in excluding Dr. [Williams'] opinion, the district court strayed from its role as the gatekeeper of reliable and relevant expert evidence into the realm of resolving contested issues of fact." *Richardson v. Corr. Med. Care, Inc.*, 2023 WL 3490904, at *3 (2d Cir. May 17, 2023). The court may not "'exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *58 (S.D.N.Y. Jan. 30, 2025) (quoting Fed. R. Evid. 702 Adv. Comm. 2000)). But that is exactly what the court did here by preventing Dr. Williams from calculating damages based on

71

NASL's reasonable factual contention that it would have settled its disputed financial obligation to Team Holdings in the but-for world, as it did in the actual world. Indeed, it was more speculative to assume that a settlement would *not* have occurred, as a settlement happened in reality.

Second, under established antitrust damages law, when uncertainty about a plaintiff's damages results from the defendants' anticompetitive conduct, "'the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly…. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.'" *Zenith*, 395 U.S. at 124 (quoting *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264–65 (1946)); *N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077–78 (2d Cir. 1988) (same). That is precisely the situation here. It was Defendants' antitrust violations that created uncertainty about the terms on which NASL would have settled with Team Holdings in the but-for world.

## CONCLUSION

For all the foregoing reasons, this Court should reverse the above errors, vacate the trial verdict, and remand for a new trial.

72

DECEMBER 23, 2025

Respectfully submitted,

**WINSTON & STRAWN LLP**

<u>s/Jeffrey L. Kessler</u>
JEFFREY L. KESSLER
EVA W. COLE
JOHANNA RAE HUDGENS
MARK E. RIZIK JR.
200 Park Avenue
New York, New York 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com
ewcole@winston.com
jhudgens@winston.com
mrizik@winston.com

*Counsel for Plaintiff-Appellant North American Soccer League, LLC*

73

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this document complies with the type-volume limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,623 words.

I hereby further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.


DECEMBER 23, 2025

*s/Jeffrey L. Kessler*
Jeffrey L. Kessler

74

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing

has been filed electronically on December 23, 2025, and thereby has

been served electronically upon all counsel of record.

*s/Jeffrey L. Kessler*
Jeffrey L. Kessler

75